# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MELVIN VINES,                          )
                                       )
            Plaintiff,                 )
                                       )
            v.                         )          1:19CV1099
                                       )
ANDREW M. SAUL,                        )
Commissioner of Social Security,       )
                                       )
            Defendant.                 )

### MEMORANDUM OPINION AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Melvin Vines, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying Plaintiff's claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 9 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 12, 14; see also Docket Entry 13 (Plaintiff's Memorandum); Docket Entry 15 (Defendant's Memorandum)). For the reasons that follow, the Court should remand this matter for further administrative proceedings.

### I.  PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI, alleging an onset date of January 1, 2013. (Tr. 428-39.)[1] Upon denial of those claims

---

[1] Plaintiff previously applied for DIB in May 2011, resulting in an unfavorable ALJ decision on January 23, 2013 (Tr. 137-50) rendered final by the Appeals
(continued...)

initially (Tr. 162-99, 286-97) and on reconsideration (Tr. 200-43, 300-17), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 318-20).  Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing. (Tr. 42-79.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act.  (Tr. 244-61.)  The Appeals Council thereafter granted Plaintiff's request for review, and remanded the matter for a new hearing and further consideration of whether Plaintiff's impairments met or equaled the requirements of Listings 1.04A and 12.05B.  (Tr. 268-77.)

The ALJ convened a new hearing, which Plaintiff, his attorney, and a VE attended.  (Tr. 80-136.)  Following that hearing, the ALJ issued a decision finding Plaintiff not disabled.  (Tr. 12-33.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 425-27, 593-94), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1.   [Plaintiff] met the insured status requirements of the . . . Act through December 31, 2015.

2.   [Plaintiff] has not engaged in substantial gainful activity since January 1, 2013, the alleged onset date.

. . .

---

[1] (...continued)
Council's denial of review on January 10, 2014 (Tr. 155-61).

3. [Plaintiff] has the following severe impairments: osteoarthritis including the bilateral feet and great toes, right wrist tendonitis, plantar fasciitis, fat pad atrophy of the foot, hallux valgus of the right foot, degenerative disc disease, gout, obesity, depressive disorder, bipolar disorder, intellectual disorder, personality disorder, learning disability, borderline intellectual functioning, and alcohol use disorder.

. . .

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional capacity to perform medium work . . . with the following limitations: frequently climb ramps or stairs; occasionally climb ladders, ropes or scaffolds; frequently balance; and frequently reach, reach overhead, handle objects, and finger bilaterally. [Plaintiff]'s work is limited to simple, routine and repetitive tasks, but not at a production rate pace; simple work-related decisions; few, if any, changes in the routine work setting; occasional interaction with the public and supervisors; and frequent interaction with coworkers. [Plaintiff] would be off task no more than 10 percent of the time in an eight-hour workday, in addition to normal breaks (with normal breaks defined as a 10-15 minute morning and afternoon break and a 30 minute lunch break). [Plaintiff] is limited to occupations requiring no ability to read, write or do math calculations.

. . .

6. [Plaintiff] is unable to perform any past relevant work.

. . .

10. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [he] can perform.

. . .

3

> 11. [Plaintiff] has not been under a disability, as
> defined in the . . . Act, from January 1, 2013, through
> the date of this decision.

(Tr. 17-32 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." <u>Hines v. Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981). Even given those limitations, the Court should remand this case for further administrative proceedings.

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." <u>Hines</u>, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1992) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Mastro</u>

4

v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence."  Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]."  Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)."  Id. at 179 (internal quotation marks omitted).  "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law."  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

5

to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry.

---

[2] The Act "comprises two disability benefits programs. [DIB] provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

6

For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

7

claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

## B. Assignments of Error

According to Plaintiff, the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ erred by failing to either accord substantial weight to the favorable Medicaid decision [by the North Carolina Department of Health and Human Services on October 9, 2018 ('2018 NCDHHS decision')] or provide specific, persuasive and valid reasons for not doing so" (Docket Entry 13 at 4 (bold font and single-spacing omitted));

2) "[t]he ALJ erred by finding that Plaintiff did not meet Listing 12.05B" (id. at 9 (bold font omitted));

3) "[t]he decision of the ALJ violates *Albright* and [Acquiescence Ruling 00-1(4), (Interpreting Lively v. Secretary of Health and Human Services) – Effect of Prior Disability Findings on

---

[5] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

<u>Adjudication of a Subsequent Disability Claim – Titles II and XVI of the Social Security Act</u>, 2000 WL 43774 (Jan. 12, 2000) ('AR 00-1(4)')] with regards to Plaintiff's [past relevant work ('PRW')] classification" (<u>id.</u> at 15 (bold font and single-spacing omitted)); and

4) "[t]he ALJ erred in his evaluation of Plaintiff's education level and PRW and thereby misapplied the [Medical-Vocational Guidelines ('Grids')] (<u>id.</u> at 17 (bold font and single-spacing omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 15 at 4-13.)

### 1. 2018 NCDHHS Decision

Plaintiff first asserts that "[t]he ALJ erred by failing to either accord substantial weight to the [2018 NCDHHS decision] or provide specific, persuasive and valid reasons for not doing so." (Docket Entry 13 at 4 (bold font and single-spacing omitted).) In particular, Plaintiff faults the ALJ for affording "'limited weight'" to the 2018 NCDHHS decision on the grounds that "'the[] decision[] address[ed] the ultimate issue of disability, an issue reserved to the [] Commissioner,'" and because the decision stated that it "'in no way affect[ed] any pending or future claims for [DIB] and [SSI].'" (<u>Id.</u> at 6 (internal quotation marks omitted) (quoting Tr. 29).) In that regard, Plaintiff argues that the Fourth Circuit has held that, "'in order to demonstrate that it is

9

appropriate to accord less than substantial weight to an NCDHHS disability decision, an ALJ must give persuasive, specific, valid reasons for doing so that are supported by the record.'" (<u>Id.</u> (internal quotation marks omitted) (quoting <u>Woods v. Berryhill</u>, 888 F.3d 686, 692-93 (4th Cir. 2018)).) According to Plaintiff, the ALJ's "generic explanation, which could apply to every [] decision, is neither persuasive nor specific." (<u>Id.</u> (quoting <u>Woods</u>, 888 F.3d at 693).) Plaintiff further contends that "the ALJ's statement that 'the [2018 NCDHHS] decision is not consistent with the complete record before the [ALJ], as described [in the ALJ's decision], to include the opinions of the consultative examiners" is conclusory without explaining how such evidence undercuts the [2018] NCDHHS decision." (<u>Id.</u> at 7 (quoting Tr. 29, and citing <u>Sabourin v. Saul</u>, No. 5:18CV410, at 7 (E.D.N.C. Jul. 15, 2019) (unpublished), and <u>Miles v. Saul</u>, No. 5:18CV422, at 12 (E.D.N.C. Sept. 6, 2019) (unpublished)).) Plaintiff thus argues that, because "[t]he ALJ engaged in no substantive analysis of [the 2018] NCDHHS decision, . . . the ALJ's decision must be vacated and the claim remanded for compliance with <u>Woods</u>." (<u>Id.</u> at 9.) That argument has merit and warrants remand.

The Fourth Circuit addressed for the first time the "weight that the SSA must afford to a VA disability rating" in <u>Bird v. Commissioner of Soc. Sec. Admin.</u>, 699 F.3d 337, 343 (4th Cir. 2012). After reviewing the "varying degrees of evidentiary

10

significance" other circuits afford VA disability ratings, the Fourth Circuit held as follows:

> The VA rating decision reached in [the plaintiff's] case resulted from an evaluation of the same condition and the same underlying evidence that was relevant to the decision facing the VA. Like the VA, the SSA was required to undertake a comprehensive evaluation of [the plaintiff's] medical condition. <u>Because the purpose and evaluation methodology of both programs are closely related, a disability rating by one of the two agencies is highly relevant to the disability determination of the other agency</u>. Thus, we hold that, in making a disability determination, the SSA must give <u>substantial weight</u> to a VA disability rating. However, because the SSA employs its own standards for evaluating a claimant's alleged disability, and because the effective date of coverage for a claimant's disability under the two programs likely will vary, an ALJ may give less weight to a VA disability rating when the record before the ALJ <u>clearly demonstrates</u> that such a deviation is appropriate.

<u>Bird</u>, 699 F.3d at 343 (emphasis added).

Following <u>Bird</u>, the Fourth Circuit further clarified "what an ALJ must do" to clearly demonstrate the appropriateness of a deviation from <u>Bird</u>'s substantial weight standard in a case involving an NCDHHS disability determination:

> We now conclude, consistent with our sister circuits, that in order to demonstrate that it is "appropriate" to accord less than "substantial weight" to an NCDHHS disability decision, an ALJ must give "<u>persuasive, specific, valid reasons for doing so that are supported by the record</u>."

<u>Woods</u>, 888 F.3d at 692 (quoting <u>McCartey v. Massanari</u>, 298 F.3d 1072, 1076 (9th Cir. 2002)) (emphasis added); <u>see also</u> Social Security Ruling 06-03p, <u>Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability</u>

11

by Other Governmental and Nongovernmental Agencies, 2006 WL
2329939, at *6-7 (Aug. 9, 2006) ("SSR 06-03p") ("[E]vidence of a
disability decision by another governmental . . . agency cannot be
ignored and must be considered," and "the [ALJ] should explain the
consideration given to these decisions in the notice of
decision").[6]

In this case, the 2018 NCDHHS decision reversed the
determination of the Durham County Department of Social Services,
and found that Plaintiff met the requirements of Listing 12.05B and
qualified as disabled as of December 2017. (See Tr. 370-72.) The
ALJ analyzed and weighed the NCDHHS's determination as follows:

> The [ALJ] gave limited weight to the [NCDHHS] decisions
> in August 2016 and October 2018 regarding [Plaintiff]'s
> entitlement to Medicaid. First, these decisions address
> the ultimate issue of disability, an issue reserved to
> the [] Commissioner. Second, the [2018 NCDHHS] decision,
> finding [Plaintiff] disabled and eligible for Medicaid,
> specifically states, "This decision in no way affects any
> pending or future claims for [DIB] or [SSI]." Third, the
> [2018 NCDHHS] decision is not consistent with the
> complete record before the [ALJ], as described [in the

---

[6] For claims filed on or after March 27, 2017, the SSA has rescinded SSR 06-03p
and amended 20 C.F.R. §§ 404.1504 and 416.904. See 82 Fed. Reg. 5844 (Jan. 18,
2017); 82 Fed. Reg. 15263-01 (Mar. 27, 2017). The new regulations state that the
SSA "will not provide any analysis in [its] determination or decision about a
decision made by any other governmental agency or a nongovernmental entity about
whether you are disabled, blind, employable, or entitled to any benefits," 20
C.F.R. §§ 404.1504, 416.904. In rescinding SSR 06-03p, the SSA noted that, for
claims filed on or after March 27, 2017, ALJs "will not provide any articulation
about their consideration of decisions from other governmental agencies and
nongovernmental entities because this evidence is inherently neither valuable nor
persuasive." 82 Fed. Reg. 15263-01. Because Plaintiff filed his claims for DIB
and SSI in 2014 (see Tr. 428-39), this Recommendation will apply SSR 06-03p and
the prior versions of Sections 404.1504 and 416.904 to Plaintiff's contentions
in his first assignment of error.

ALJ's decision], to include the opinions of the consultative examiners.

(Tr. 29 (internal citation omitted).)[7]

The ALJ's consideration of the 2018 NCDHHS decision runs afoul of <u>Woods</u>. To begin, the ALJ's discounting of the 2018 NCDHHS decision because it included the proviso that it "'in no way affect[ed] any pending or future claims for [DIB] and [SSI]'" (<u>id.</u>), disregards the Fourth Circuit's express rejection, as "neither persuasive nor specific," of that "generic explanation, which could apply to every NCDHHS decision," <u>Woods</u>, 888 F.3d at 693. Moreover, although the ALJ's reliance upon the SSA's rule that the "ultimate issue of disability" constitutes "an issue reserved to the [] Commissioner" (Tr. 29), <u>see</u> 20 C.F.R. §§ 414.1527(d), 416.927(d), supports the ALJ's decision to accord "limited weight" (Tr. 29) to the NCDHHS's ultimate determination that Plaintiff qualified as disabled (<u>see</u> Tr. 280), that rule did not authorize the ALJ to disregard the NCDHHS's specific findings that Plaintiff's "impairments of intellectual disability and specific learning disabilities in reading, math, and written expression . . . result[ed] in <u>significant</u> work related limitations" (Tr. 279 (emphasis added)), that "objective medical evidence" supported that finding (<u>id.</u>), that "school records indicate[d Plaintiff] was in special education courses[, ] was

---

[7] In August 2016, the NCDHHS affirmed the decision of the Durham County Department of Social Services on a prior application by Plaintiff finding he did not meet the disability requirements for Medicaid. (<u>See</u> Tr. 564-67.)

13

retained in the 10th grade and apparently was socially promoted at least once" (id.), that "[a] vocational evaluation in November 2011 . . . yielded a full scale IQ score of 66[, and Plaintiff] was also noted to have first to second grade reading levels and fourth grade math skills" (id.), and that, at "[a] neuropsychological evaluation in August 2017," the psychologist noted that "[a] review of [Plaintiff's] records indicated [his] low intellectual functioning had been present since childhood" (id.). See Woods, 888 F.3d at 693 (noting that, to state "persuasive, specific, valid" reasons for deviating from the substantial weight standard, "an ALJ could explain which aspects of the prior agency decision he finds not credible and why, [or] describe why he finds other evidence more credible").

Moreover, the ALJ's statement that "the [2018 NCDHHS] decision is not consistent with the complete record before the [ALJ], as described [in the ALJ's decision], to include the opinions of the consultative examiners" (Tr. 29 (emphasis added)) does not provide a "persuasive, specific, valid reason[] . . . supported by the record," Woods, 888 F.3d at 693, for deviating from the substantial weight standard. As an initial matter, the record contains consultative examinations from no fewer than nine sources ranging in time from 2004 to 2017 (see Tr. 652-55, 656-59, 734-37, 739-44, 832-57, 865-68, 879-84, 1049-52, 1394-1400); yet, the ALJ neither identified which consultative examiners' opinions lacked consistency with the 2018 NCDHHS decision, nor explained how they

14

lacked consistency (see Tr. 29). Moreover, although the ALJ discussed and assigned either moderate, significant or substantial weight to the findings and opinions from all nine of the consultative evaluations (see Tr. 24-29), those same evaluations contained findings and opinions that do not appear to lack consistency with the 2018 NCDHHS decision. For example:

- Dr. Katharine V. Raleigh, to whom the ALJ accorded "moderate weight" (Tr. 24), observed in July 2004 that she had to redirect Plaintiff "frequently" (Tr. 866 (emphasis added)), that his ability to sustain attention and concentration rated as "mentally deficient" at the 0.1 percentile (Tr. 867 (emphasis added)), that Plaintiff read at a second grade level, spelled at a first grade level, and handled math at a fourth grade level (id.), that, although Plaintiff had good "adaptive behavior" due to a "supportive family" and "good social skills," he had "unrealistic plans" and "lack[ed] awareness of his own deficits" (Tr. 869), and that Plaintiff's issues with short-term and long-term memory evidenced a decline from prior functioning (see id.);

- James R. Tedrow, M.A., to whom the ALJ gave "[s]ignificant weight" (Tr. 27), described Plaintiff in November 2011 as "not a good problem solver or long term planner" who "must rely on others" (Tr. 883), opined that Plaintiff "ha[d] difficulty initiating, anticipating, generalizing, and integrating information into a usable form" (id.), and noted Plaintiff's "lofty" and unrealistic plans for starting his own business (Tr. 882);

- Dr. Sarah Elizabeth Cook, to whom the ALJ assigned "significant weight" (Tr. 24), remarked in June 2012 that Plaintiff "had significant difficulties comprehending task instructions, requiring repetition of instructions where possible," and that he "had some difficulties remaining focused during the evaluation, particularly after lunch, appearing fatigued" (Tr. 1050 (emphasis added)), as well as that he performed cognitively at the level

15

of "<u>mild mental retardation</u>," but that she lacked sufficient information to assess his adaptive skills (Tr. 1052 (emphasis added));

- Dr. Betsy Pedersen, to whom the ALJ allotted "substantial weight" (Tr. 29), noted in March 2016 that Plaintiff could not understand the directions during testing of his immediate retention and recall (<u>see</u> Tr. 853), and provided an Addendum to her opinion that Plaintiff (through previous testing) had met the criteria for "borderline intellectual functioning" (Tr. 856), opining that Plaintiff's school records actually supported a diagnosis of "mild <u>intellectual disorder</u>" (Tr. 832); and

- Dr. Jill Zukerman Stuart, to whom the ALJ afforded "significant weight" (Tr. 26), noted in August 2017 that, although Plaintiff's attention remained "adequate" for testing purposes, she had to redirect him several times due to tangential comments (Tr. 1398), and that Plaintiff rated as "borderline" on the Independent Living Scales regarding health and safety awareness (Tr. 1399).

Significantly, the 2018 NCDHHS decision expressly relied on findings and opinions from Tedrow, Dr. Cook, Dr. Pederson, and Dr. Stuart in reaching its determination that Plaintiff's intellectual disorder met the requirements of Listing 12.05B. (<u>See</u> Tr. 279; <u>see also</u> Tr. 832-57, 879-82, 1049-52, 1394-1400.)

In sum, the ALJ's failure to provide "persuasive, specific, valid reasons," <u>Woods</u>, 888 F.3d at 693, for rejecting the 2018 NCDHHS decision requires remand.

### 2. Listing 12.05B

Plaintiff next alleges that "[t]he ALJ erred by finding that Plaintiff did not meet Listing 12.05B." (Docket Entry 13 at 9 (bold font omitted).) More specifically, Plaintiff challenges the

16

ALJ's findings that Plaintiff "only had a moderate limitation in understanding, remembering or applying information" (id. at 10) and "possessed only moderate limitations in adapting or managing [him]self" (id. at 11). According to Plaintiff, "the record demonstrates that [he] possesses marked to extreme limitation in both his ability to understand, remember or apply information and in his ability to adapt or manage [him]self." (Id. at 11-12; see also id. at 12-15 (describing evidence Plaintiff believes supports marked to extreme limitations in those functional areas (citing Tr. 100, 110, 111-12, 119, 121-24, 269, 488, 511, 652, 656, 832, 834, 845, 852, 867-68, 879, 880, 882, 883, 888-89, 890, 1050, 1138, 1399-1400, 1427, 1497, 1517, 1520, 1522, 1667)).) Plaintiff thus contends that "the ALJ's decision should be reversed for an award of benefits due to [Plaintiff's intellectual disorder/mental retardation] meeting the requirements of Listing 12.05B." (Id. at 15.)

Listing 12.05B requires a showing of 1) "[s]ignificantly subaverage general intellectual functioning," 2) "[a] full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence," and 3) "[s]ignificant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: [u]nderstand, remember, or apply information; [i]nteract with others; [c]oncentrate, persist, or maintain pace; [a]dapt or manage

17

oneself." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.05B (emphasis added) (subsection lettering and internal citations omitted). Understanding, remembering, or applying information "refers to the abilities to learn, recall, and use information to perform work activities" and "[e]xamples include: [u]nderstanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00E.1. Adapting or managing oneself "refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting" and "[e]xamples include: [r]esponding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions." Id., § 12.00E.4.

The ALJ provided the following analyses of those areas of mental functioning:

> In understanding, remembering, or applying information, [Plaintiff] has moderate limitation. [Plaintiff] complained of several issues in this area, including with

reading, writing, learning, and maintaining his emotional
stability. Somewhat consistently, the record reflects a
history of reduced cognitive functioning as early as July
2004, as well as multiple full scale IQ scores of between
63 to 70. At the same time, however, this same body of
evidence reflects limited mental health treatment,
consisting of sporadic and infrequent mental health
treatment, with routine prescription medication
management and limited mental health therapy.
Consistently, [Plaintiff] exhibited little to no acute
emotional or cognitive symptoms during his various
psychological testing sessions of record. And, even with
his minimal treatment, [Plaintiff] admitted to being
capable of a wide range of activities independently,
including caring for himself and his pet, routinely
driving, preparing meals, completing his household
chores, shopping in stores, and understanding and
following all his medical instructions. Such behavior,
particularly in combination with [Plaintiff]'s limited
mental health treatment, and in spite of his learning and
intellectual disorders, supports that [Plaintiff] is
capable of understanding and learning terms, asking and
answering questions, and sequencing a range of simple
activities.

. . .

In adapting or managing oneself, [Plaintiff] has <u>moderate</u>
limitation. The generally conservative medical treatment
of record and his own stated activities of daily living
show that he remains capable of distinguishing between
acceptable and unacceptable work performance, making
plans independently of others, maintaining his personal
hygiene and attire appropriate to a work setting, and
otherwise managing his psychologically based symptoms,
albeit with the benefit of prescription medication.

. . .

The above findings are supported by the assessments of
the [s]tate agency psychological consultants, who
together found no more than moderate mental limitations
and concluded that [Plaintiff] could perform simple,
routine and repetitive tasks in a low stress, structured
work setting, with limited interpersonal contact (B3A/B4A
and B7 A/BSA). These assessments are given <u>significant</u>
<u>weight</u> overall, as they are mostly consistent with the
evidence at the time and supported by explanations. More
weight is given to the initial assessment, as it is

19

better supported by the evidence at the time and more
consistent with the overall evidence of record. While it
is clear from the record that [Plaintiff] has some
reduced cognition and general intellectual functioning,
[Plaintiff] has maintained a long history of overall
intact and stable cognition and emotional functioning,
even during periods in which he was not receiving any
mental health treatment, with mental health treatment
consisting mostly of routine prescription medication
management. The [ALJ] does note that these assessments
were made prior to the implementation of the Final Rule
concerning the Revised Medical Criteria for Evaluating
Mental Disorders, 81 Fed. Reg. 66138 (published September
29, 2016, effective January 17, 2017), and that the
revised criteria for evaluating mental disorders with
regard to the "A," "B," and "C" criteria are now
materially different.

(Tr. 20-21 (emphasis added) (internal parenthetical citations
omitted).)

Plaintiff first faults the ALJ's reliance on Plaintiff's lack
of "extensive mental health treatment" in the above-quoted
analysis, arguing that "[intellectual disability] or mental
retardation . . . is not amenable to mental health treatment the
way that depression and anxiety are[, but ] is a lifelong condition
an individual is born with and which persists throughout their
life." (Docket Entry 13 at 10 (citing Luckey v. United States
Dep't of Health & Human Servs., 890 F.2d 666, 668 (4th Cir.
1989)).) Plaintiff's argument, however, fails to recognize that
the ALJ considered the effects of both Plaintiff's intellectual and
emotional impairments in rating the degree of limitation in the
areas of mental functioning. The ALJ found that Plaintiff suffered
from severe depressive disorder and bipolar disorder at step two of
the SEP (see Tr. 18), and expressly considered whether those

20

impairments met or equaled the criteria of Listing 12.04 for affective disorders at step three (see Tr. 19), which shares the same paragraph B criteria as Listing 12.05B, compare 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04B, with id., § 12.05B. The ALJ's consideration of Plaintiff's "sporadic and infrequent mental health treatment, with routine prescription medication management and limited mental health therapy" (Tr. 20) remained entirely an appropriate area of inquiry for evaluating the impact of Plaintiff's emotional disorders, just as the ALJ's reliance on Plaintiff's "exhibit[ion of] little to no acute . . . cognitive symptoms during his various psychological testing sessions of record" (id.) constituted an appropriate consideration for evaluating the effect of Plaintiff's intellectual disorders.

Plaintiff additionally challenges the ALJ's reliance on Plaintiff's daily activities to find only moderate limitation in the functional areas at issue, pointing out that "the fact that you engage in common everyday activities, such as caring for your personal needs, preparing simple meals, or driving a car, will not always mean that you do not have deficits in adaptive functioning as required by 12.05B2." (Docket Entry 13 at 10 (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00H, and Cavarra v. Astrue, 393 F. App'x 612, 614-15 (11th Cir. 2010)).) That contention falls short for two reasons. First, the ALJ did not solely rely on Plaintiff's daily activities to find moderate limitation in the areas of functioning, but rather as one part of his overall analysis. (See

21

Tr. 20-21.) Second, <u>Cavarra</u> does not aid Plaintiff's cause, because in that case, "the ALJ's description [of the plaintiff's daily activities] mischaracterize[d the plaintiff]'s testimony" by failing to acknowledge the plaintiff's significant qualifications about his ability to engage in those activities, <u>Cavarra</u>, 393 F. App'x at 615. Plaintiff makes no argument here that the ALJ failed to acknowledge any qualifications in Plaintiff's stated ability to engage in daily activities. (<u>See</u> Docket Entry 13 at 10-11.)

Next, Plaintiff describes evidence that he believes supported marked to extreme limitations in understanding, remembering, or applying information and adapting or managing oneself. (<u>See</u> Docket Entry 13 at 12-15 (citing Tr. 100, 110, 111-12, 119, 121-24, 269, 488, 511, 652, 656, 832, 834, 845, 852, 867-68, 879, 880, 882, 883, 888-89, 890, 1050, 1138, 1399-1400, 1427, 1497, 1517, 1520, 1522, 1667).) Plaintiff, however, misinterprets this Court's standard of review. The Court must determine whether substantial evidence, i.e., "more than a mere scintilla of evidence but . . . somewhat less than a preponderance," <u>Mastro</u>, 270 F.3d at 176 (brackets and internal quotation marks omitted), supported the ALJ's findings regarding Plaintiff's limitations in the two functional areas at issue, and not whether other record evidence weighed against those findings, <u>see</u> <u>Lanier v. Colvin</u>, No. CV414-004, 2015 WL 3622619, at *1 (S.D. Ga. June 9, 2015) (unpublished) ("The fact that [the p]laintiff disagrees with the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's

22

decision, does not mean that the decision is unsupported by substantial evidence.").

Here, as the above-quoted analysis shows, the ALJ cited to substantial evidence to support his findings of moderate limitation in the two functional areas (see Tr. 20-21), including affording "significant weight" to the opinions of the state agency psychological consultants (Tr. 21). Although record evidence exists that could support greater limitations in the functional areas, the record does not compel a finding of marked or extreme limitation in either functional area. See Stallworth v. Commissioner of Soc. Sec., No. 1:12CV496, 2013 WL 2897879, at *10 (S.D. Ohio Jun. 13, 2013) (unpublished) (holding that ALJ's failure to find greater limitations fell within ALJ's "zone of choice" because supported by substantial evidence); Penick v. Astrue, No. 3:08CV549, 2009 WL 3055446, at *9 (E.D. Va. Sept. 23, 2009) (unpublished) (recognizing general right of ALJ to rely on state agency consultants).

For the foregoing reasons, the Court should deny relief on Plaintiff's second issue on review.[8]

---

[8] Due to the undersigned's recommendation to remand this matter for an ALJ to reevaluate and reweigh the 2018 NCDHHS decision finding that Plaintiff's intellectual disorder met the requirements of Listing 12.05B, the ALJ should also, upon remand and in light of his reconsideration of the 2018 NCDHHS decision, reevaluate whether Plaintiff's intellectual disorder meets or equals the requirements of Listing 12.05B.

23

### 3. Classification of Prior Welding Work

Plaintiff's third assignment of error asserts that "[t]he decision of the ALJ violates *Albright* and AR 00-1(4) with regards to Plaintiff's PRW classification." (Docket Entry 13 at 15 (bold font and single-spacing omitted).) In particular, Plaintiff points out that the ALJ who adjudicated Plaintiff's prior claim for DIB on January 23, 2013, "classified [Plaintiff's] welding work as 'welder helper' which has a [Dictionary of Occupational Titles ('DOT')] code of 819.687-014 and is classified as 'unskilled' with a specific vocational preparation ('SVP') of two. (Id. (citing Tr. 149).) Plaintiff further notes that the 2013 ALJ "decision became final and thus subject to res judicata when [Plaintiff] did not appeal his January 10, 2014 [Appeals Council] denial." (Id. (citing Tr. 155).) According to Plaintiff, Albright and AR 00-1(4) required the current ALJ to "assess whether such prior [ALJ's] finding [with regard to the classification of Plaintiff's PRW as a welder helper] was subject to change with the passage of time, the likelihood of such change and the extent to which evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim." (Id. at 16 (citing Albright, 174 F.3d at 477, and AR 00-1(4)).) Plaintiff contends, however, that "the ALJ did not explain why he classified [Plaintiff's] welding work as 'welder' with a [DOT] code of

24

810.384-014 which is a skilled job" (id. (citing Tr. 31)), despite the fact that the ALJ afforded the prior ALJ's findings "substantial weight" under Albright and AR 00-1(4) (id. at 16-17 (citing Tr. 30)). Plaintiff further asserts that "there are no circumstances under AR 00-1(4) or *Albright* which could have justified reclassifying [Plaintiff's] welding work" (id. at 17), and that the ALJ's "error was very harmful as had [Plaintiff's] welding work been properly classified as 'welder helper' as opposed to 'welder,' a finding of 'disabled' would have been directed by the [G]rids . . . when he attained 60 years of age, as he has a less than marginal level of education[] . . . and PRW which is unskilled" (id. (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 203.01)).

In Albright, the Fourth Circuit addressed the manner in which an ALJ should consider a final decision of the Commissioner regarding a claimant's prior application for benefits. See Albright, 174 F.3d at 474-78. In that case, the new ALJ did not analyze whether the claimant's condition had worsened since the prior ALJ's decision, but rather simply adopted the prior ALJ's denial of benefits as res judicata based upon Acquiescence Ruling 94-2(4) ("AR 94-2(4)"). Id. at 474, 475. AR 94-2(4) required ALJs to adopt findings from prior ALJ decisions unless the claimant produced new and material evidence. Id. The Fourth Circuit found the application of AR 94-2(4) to the new claim for benefits

"imprudent," id. at 477, and contrary to the SSA's long-standing "treatment of later-filed applications as separate claims," id. at 476.

In response to Albright, the SSA issued AR 00-1(4), which provides as follows:

> When adjudicating a subsequent disability claim . . ., an [ALJ] determining whether a claimant is disabled during a previously unadjudicated period must consider . . . a prior finding [of a claimant's RFC or other finding required at a step in the SEP] as evidence and give it appropriate weight in light of all relevant facts and circumstances. In determining the weight to be given such a prior finding, an [ALJ] will consider such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

AR 00-1(4), 2000 WL 43774, at *4 (emphasis added).

Here, the ALJ explained the weight he accorded to the prior ALJ's decision as follows:

> The [ALJ] considered the prior [ALJ] decision in accordance with [AR] 00-1(4) and gave the findings therein substantial weight. However, the current record before the [ALJ] supports additional impairments and limitations.

(Tr. 30 (internal citation omitted) (emphasis added).) Despite according the findings in the prior ALJ's decision "substantial weight" (id.), the ALJ proceeded at step four of the SEP to adopt the VE's classification of Plaintiff's PRW in welding as the

26

skilled job Welder (<u>DOT</u> No. 810.384-014) (<u>see</u> Tr. 31, 131), and did not provide any explanation for deviating from the prior ALJ's finding (<u>see</u> <u>id.</u>) that Plaintiff's welding PRW rated as the <u>unskilled</u> job Welder Helper (<u>DOT</u> 819.687-014) (<u>see</u> Tr. 149). Although the ALJ <u>could have</u> pointed to testimony and/or other evidence regarding the details of Plaintiff's welding-related PRW that differed from the evidence before the prior ALJ, he did not do so. (<u>See</u> Tr. 31.) Thus, the Court cannot meaningfully review why the current ALJ found that Plaintiff's welding-related PRW qualified as skilled, a finding less favorable to Plaintiff. <u>See</u> <u>Manuel v. Colvin</u>, No. 1:11CV8, 2015 WL 519481, at *5 (M.D.N.C. Feb. 9, 2015) (unpublished) (Peake, M.J.) (remanding where current ALJ found the plaintiff could perform PRW but previous ALJ found the plaintiff could not, and current ALJ "did not address . . . the prior inconsistent determination" which "appear[ed] to be based on a change in the categorization of [the p]laintiff's [PRW]," as well as noting possibility that "additional evidence presented by the [VE] . . . [i]n the [curr]ent claim [might have] created a basis for making a different [step four] finding" but that, "[b]ecause the [current] ALJ did not address the prior ruling, th[e] Court cannot . . . determine whether the ALJ weighed the prior adjudication in accordance with AR 00-1(4)"), <u>recommendation</u> <u>adopted</u>, slip op. (M.D.N.C. Mar. 3, 2015) (Osteen, Jr., C.J.); <u>see</u> <u>also</u> <u>Pickett v. Berryhill</u>, No. 7:17CV238, 2019 WL 847745, at *4 (E.D.N.C. Jan. 28, 2019) (unpublished) ("Courts within the Fourth

27

Circuit have generally found remand appropriate under AR 00-1(4) where an ALJ neglects to discuss a prior decision . . . [which] contains findings more favorable to the claimant than the ALJ's subsequent decision." (collecting cases)), recommendation adopted, 2019 WL 845415 (E.D.N.C. Feb. 21, 2019) (unpublished); Craft v. Colvin, No. 1:16CV97, 2017 WL 239375, at *4 (M.D.N.C. Jan. 19, 2017) (unpublished) (Webster, M.J.) (finding that "ALJ's written decision must provide some explanation for discrediting or failing to adopt past administrative findings favorable to the claimant"), recommendation adopted, slip op. (M.D.N.C. Feb. 17, 2017) (Osteen, Jr., C.J.).

Because, as explained more fully below, the ALJ misclassified Plaintiff's education level, the ALJ's failure to explain why he deviated from the prior ALJ's decision and deemed Plaintiff's welding-related PRW as skilled constitutes prejudicial error. Plaintiff turned 60 years old, or "closely approaching retirement age," 20 C.F.R. §§ 404.1563(e), 416.963(e), during the period of adjudication (see Tr. 31), and the ALJ limited Plaintiff to medium work (see Tr. 22), such that Grid Rule 203.01 would direct a conclusion of "disabled" if the ALJ categorized Plaintiff's welding-related PRW as "unskilled" and found Plaintiff possessed only a "marginal" education, 20 C.F.R. §§ 404.1564(b)(2), 416.964(b)(2) (or qualified as "illiterate," 20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1)), 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 203.01. See Pickett, 2019 WL 847745, at *6 (rejecting

28

treatment of ALJ's error at step four as harmless, where "a determination that [the plaintiff] was unable to return to [PRW] would direct a finding of 'disabled' under the Grids").

In short, the ALJ failed to comply with <u>Albright</u> and AR 00-1(4) in his consideration of the prior ALJ's decision, providing an additional basis for remand.

### 4. Education Level

Lastly, Plaintiff maintains that "[t]he ALJ erred in his evaluation of Plaintiff's education level and PRW and thereby misapplied the [G]rids." (Docket Entry 13 at 17 (bold font and single-spacing omitted).) According to Plaintiff, the ALJ determined, "[w]ithout analysis, . . . that [Plaintiff] had a high school education when applying the [G]rids and evaluating the case at [s]tep [f]ive of the SEP" (<u>id.</u> at 17-18 (citing Tr. 31)); "[y]et, in [the] RFC assessment, the ALJ acknowledged that [Plaintiff] was illiterate, unable to perform any work involving reading or writing and that he was also incapable of performing math calculations" (<u>id.</u> at 18 (citing Tr. 23)). Plaintiff thus contends that "the ALJ should have classified [Plaintiff's] educational abilities as 'illiterate[]' [or,] . . . at the very most, . . . as [not] more than 'marginal.'" (<u>Id.</u>) Plaintiff deems the ALJ's error in that regard "very harmful" (<u>id.</u> at 19) as, had the ALJ properly classified Plaintiff's welding-related PRW as unskilled work and rated his education level as "marginal" or

"illiterate," Grid Rule 203.01 would have directed a conclusion of "disabled" (id. (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 203.01)).

The ALJ remarked that Plaintiff's school records showed that he "achieved largely _average_ grades in his high school years, reportedly in a special education setting" (Tr. 24 (emphasis added); see also Tr. 836), but also acknowledged that those records "reflected an apparent final grade point average of 1.52" (Tr. 26 (emphasis added); see also Tr. 836), and that psychological testing documented that Plaintiff "exhibited first to second grade reading ability and fourth grade level math skills, with 'very low visual, auditory, and global memory' and primary difficulties reading words and understanding oral language" (Tr. 27 (quoting Tr. 890); see also Tr. 879-84).   In the RFC, the ALJ limited Plaintiff to "occupations requiring _no_ ability to read, write or do math calculations" (Tr. 23 (emphasis added) (bold font omitted)), but then concluded, at step five of the SEP that Plaintiff "ha[d] at least a high school education" (Tr. 31).

The regulations define the relevant levels of education as follows:

> . . . _Illiteracy_ means the inability to read or write. [The SSA] consider[s] someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. _Generally_, an illiterate person has had little or no formal schooling.

> . . . _Marginal education_ means ability in reasoning, arithmetic, and language skills which are needed to do

simple, unskilled types of jobs. [The SSA] generally consider[s] that <u>formal schooling at a 6th grade level or less</u> is a marginal education.

. . . <u>Limited education</u> means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. [The SSA] generally consider[s] that a <u>7th grade through the 11th grade level of formal education</u> is a limited education.

. . . <u>High school education and above</u> means abilities in reasoning, arithmetic, and language skills acquired through <u>formal schooling at a 12th grade level or above</u>. We generally consider that someone with these educational abilities can do semi-skilled through skilled work.

20 C.F.R. §§ 404.1564(b), 416.964(b) (emphasis added). Those regulatory provisions also expressly acknowledge that, "[f]ormal education that [a claimant] completed many years before [his or her] impairment began, or unused skills and knowledge that were a part of [his or her] formal education, may no longer be useful or meaningful in terms of [the] ability to work," and that "the numerical grade level that [a claimant] completed in school may not represent [his or her] actual educational abilities." <u>Id.</u> Thus, the SSA "will use [a claimant's] numerical grade level to determine [his or her] educational abilities" <u>only</u> "if there is <u>no other evidence to contradict it</u>." <u>Id.</u> (emphasis added).

Here, the ALJ erred by finding that Plaintiff "ha[d] at least a high school education." (Tr. 31.) Although the record establishes that Plaintiff graduated from high school (<u>see</u> Tr. 87-88, 836), the record contains voluminous evidence contradicting that Plaintiff actually achieved a 12th grade educational level.

31

For example, Plaintiff's high school records reflect that he received many very low and failing grades, even in classes such as "[b]asic" English, math, science, and history, and that he did not pass the 10th grade but proceeded to the 11th grade through apparent social promotion. (Tr. 836.) Plaintiff's scores on the Wide Range Achievement Test 3 placed his reading and spelling skills at the first grade level and his mathematical skills at the fourth grade level. (See Tr. 867; see also Tr. 881-82 (reflecting similar results on Woodcock-Johnson III).) Consistent with that evidence, a disability examiner documented that Plaintiff had difficulties with reading, understanding, concentrating, talking, and answering, and noted that she had to repeat questions multiple times. (See Tr. 488.) Plaintiff's Vocational Rehabilitation history reflects Plaintiff's difficulties reading, counting money, and understanding a calculator. (See Tr. 889.)

Furthermore, the above-described evidence harmonizes with Plaintiff's testimony, which included the following statements:

- Plaintiff remained in special education throughout his time in school (see Tr. 88), repeated one grade (see Tr. 121), and did not have to pass a test to obtain his diploma but rather, used a sheltered workshop he attended for half days to graduate (see Tr. 120-21);

- Plaintiff passed the written North Carolina driver's license test because his brother took the test for him (see Tr. 126);

- Plaintiff could not fill out job applications (see 121), read menus (see Tr. 126), or complete the SSA's forms (see id.);

32

- Plaintiff asked his daughters to help him to read his mail (see Tr. 110) and used only cash to purchase items because he could not manage a bank account (see Tr. 111); and

- Plaintiff lost jobs because he could not pass aptitude tests (see Tr. 121) and because he did not understand the technology required by some jobs (see Tr. 122).

Thus, the ALJ erred by finding that Plaintiff possessed "at least a high school education." (Tr. 31.) Moreover, as discussed above, that error does not qualify as harmless under the circumstances of this case because, if the ALJ had found that Plaintiff fell into the categories of marginal education or illiterate and had classified Plaintiff's welding-related PRW as unskilled, Grid Rule 203.01 would have directed a conclusion of "disabled" as of Plaintiff's attainment of age 60 (which occurred during the period of adjudication).

Put simply, Plaintiff's fourth assignment of error has merit and entitles Plaintiff to remand.

## III.  CONCLUSION

Plaintiff has established errors warranting remand.[9]

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be vacated and that the matter be remanded

---

[9] Plaintiff's Memorandum alternatively asks for "summary judgment with a reversal of the ALJ's decision for an award of benefits, or [] with a remand of the matter for a new hearing." (Docket Entry 13 at 20.)  In this case, the Court should opt for remand, because Plaintiff's Memorandum does not adequately develop a cogent argument justifying reversal for an award of benefits.  (See id. at 15 (specifically arguing for a "revers[al] for an award of benefits" only in connection with Plaintiff's second issue on review, contending that Plaintiff's "[intellectual disability/mental retardation] me[t] the requirements of Listing 12.05B," an argument which this Recommendation found to lack merit).

under sentence four of 42 U.S.C. § 405(g), for further administrative proceedings to include 1) reevaluation and re-weighing of the NCDHHS's disability determination in accordance with Woods, the applicable regulations, and SSR 06-03p, 2) reevaluation of Plaintiff's welding-related PRW, including consideration and weighing of the 2013 ALJ decision's finding that such work qualified as unskilled, and 3) reevaluation of Plaintiff's educational level. As a result, Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 12) should be granted in part, i.e., to the extent it requests remand, and Defendant's Motion for Judgment on the Pleadings (Docket Entry 14) should be denied.

                              /s/ L. Patrick Auld
                           **L. Patrick Auld**
                    **United States Magistrate Judge**

March 2, 2021